# In the United States Court of Federal Claims

No. 23-28C
(Filed: March 31, 2023)
(Re-filed: April 7, 2023)[1]

* * * * * * * * * * * * * * * * * * * * * * * *

PERCIPIENT.AI, INC.,

                            *Plaintiff*,

v.

THE UNITED STATES,

                            *Defendant*,

and

CACI, INC. – FEDERAL,

                            *Intervenor*.

* * * * * * * * * * * * * * * * * * * * * * * *

    *Samuel C. Kaplan*, Washington, DC, for plaintiff, Percipient.ai, with whom were *Hamish P.M. Hume*, *Eric J. Maurer*, and *Gina A. Rossman*, of counsel.

    *Reta E. Bezak*, Senior Trial Counsel, United States Department of Justice, Commercial Litigation Branch, with whom were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, *Patricia M. McCarthy*, Director, and *Corinne A. Niosi*, Assistant Director, for defendant.  *Graham Day*, National Geospatial-Intelligence Agency, of counsel.

    *Anne B. Perry*, Washington, DC, for intervenor, CACI, Inc. – Federal, with whom was *Jonathan S. Aronie* and *Ariel E. Debin*, of counsel.

---

[1] This opinion was originally issued under seal to give the parties an opportunity to propose redactions. Because the parties agreed that none were necessary, the opinion appears in full.

OPINION

This is a post-award bid protest of the National Geospatial-Intelligence Agency's alleged violation of 10 U.S.C. § 3453, a statute that requires agencies to procure commercial or non-developmental products "to the maximum extent practicable." Both the United States and the intervenor, CACI, Inc. – Federal, move to dismiss the protest for lack of subject-matter jurisdiction.

The matter is fully briefed, and oral argument was held on March 6, 2023. We denied the motions to dismiss in an order issued on March 9, 2023. This opinion more fully explains our reasoning.

BACKGROUND[2]

The National Geospatial-Intelligence Agency (NGA) obtains and analyzes images and other geospatial information to provide the federal government with intelligence data. Supplying this kind of intelligence on a global scale is a burdensome analytical task and cannot be done effectively without the help of advanced computer technology. One of those advanced technologies is computer vision, a form of artificial intelligence that "trains and uses computers to interpret the visual world." Compl. ¶ 55. With computer vision, users can more efficiently compile and analyze geospatial intelligence.

Hoping to benefit from this technology, NGA, more than three years ago, issued the SAFFIRE solicitation—which was an indefinite delivery, indefinite quantity contract containing two parts. The first was a data repository that would store and disseminate geospatial intelligence "across various large organizations." Compl. ¶ 60. The second, which is at the heart of this dispute, would integrate a computer vision system to enhance the

---

[2] When a party moves to dismiss for lack of subject matter jurisdiction, the court assumes that the undisputed facts in the complaint are true and draws reasonable inferences in the plaintiff's favor. *Acevedo v. United States*, 824 F.3d 1365, 1368 (Fed. Cir. 2016). These undisputed facts are drawn from the complaint, the attached materials, and the administrative record.

agency's ability to produce, review, and classify intelligence from "millions" of images. Compl. ¶ 58.

The plaintiff, Percipient, is a technology company that developed a computer vision software called "Mirage." Mirage is an open architecture software that works alongside other computer systems and can detect equipment, vehicles, and faces—each of which is a critical aspect of geospatial intelligence. More than that, though, Mirage's tools also allow users to narrow the computer's focus to specific objects, patterns, or geographical areas, and it can even learn to anticipate its users' needs over time. Despite these features and capabilities, Percipient did not bid on the SAFFIRE contract because its software could only fulfill SAFFIRE's computer vision requirements, not the entire contract. For that reason, Percipient relied on what it viewed as the agency's statutory obligation to consider incorporating commercial products and hoped to be part of NGA's SAFFIRE efforts.

In January 2021, NGA awarded the SAFFIRE contract to CACI and informed Percipient that if it wanted to participate in SAFFIRE, it needed to speak with CACI. This eventually led to a meeting between Percipient and CACI in March 2021. At this meeting, CACI expressed significant interest in partnering with Percipient on future projects, but explained that, as for working together on SAFFIRE, "that ship" had already "sailed." Compl. ¶ 93.

Alarmed by this revelation, Percipient asked NGA if it would independently evaluate Mirage as a possible commercial solution for SAFFIRE's computer vision system. NGA responded several weeks later and reassured Percipient of its commitment to using commercial products. NGA further explained that CACI's "ship has sailed" statement was an "unfortunate miscommunication" that did not reflect the agency's position. Compl. ¶ 100. Instead, the agency had not yet decided whether it needed to incorporate a commercial product because CACI was still reviewing NGA's legacy systems. NGA confirmed that commercial products would be evaluated once CACI finished.

Another two months went by before Percipient finally secured a meeting with CACI to demonstrate Mirage, although CACI's Program Manager—the individual largely responsible for deciding whether to

3

incorporate a commercial product—left the meeting after only 20 minutes. Still, Mirage received positive feedback, and CACI promised to evaluate Mirage more fully. This "deep dive" into Mirage never happened, however. Compl. ¶ 108.

Several months later, Percipient learned at the 2021 GEOINT Symposium that CACI would be developing a computer vision system for SAFFIRE when CACI employees visited Percipient's symposium booth. Surprised by the news, and no longer believing that CACI could fairly evaluate Mirage, Percipient met with NGA and asked to set up a demonstration. NGA agreed but requested that Percipient "ease up on the legal pressure." Compl. ¶ 118. Percipient then demonstrated Mirage's abilities to several NGA representatives in December 2021, at the end of which NGA concluded that Percipient's software met "all of NGA's analytical transformation requirements." Compl. ¶ 120.

Over the next several months, the parties worked to reach an agreement that would allow NGA to test Mirage with live data, something that Percipient agreed to do at no cost. Just before signing an agreement to that effect, however, NGA changed its tune. Citing legal and security complexities, NGA would no longer use live data and would instead use previously released and publicly available images. Percipient pushed back, claiming that these images would not allow NGA to test Mirage's geospatial module or some of its unique features, like its ability to alert changes over time. After significant delay, NGA relented and allowed the use of live data.

NGA completed its testing of Mirage in October 2022. Based on the results, Percipient suspected that NGA was not assessing Mirage as a possible commercial solution for SAFFIRE's computer vision requirements because, among other reasons, Percipient could only identify four NGA searches over the 12-week testing period. Thus, Percipient offered to extend the testing period, again at no cost, so NGA could more fully evaluate Mirage as a computer vision system. Percipient's suspicions appeared to be confirmed, though, when NGA explained one month later that it had evaluated Mirage as "an enterprise Machine Learning Platform," and not "as an Analytical tool." Compl. ¶ 137.

After Percipient's efforts to be incorporated into SAFFIRE proved unfruitful, it filed this protest. In its complaint, Percipient alleges that the

agency violated its statutory and regulatory obligations by wastefully pursuing a development solution when a possible commercial solution existed. It also alleges that the agency unlawfully delegated inherent government authority when it allowed its contractor, CACI, to determine agency policy on commercial technology. Finally, Percipient believes that the agency acted arbitrarily in handling the SAFFIRE project. In response, the government and CACI have moved to dismiss for lack of subject matter jurisdiction.

DISCUSSION

## I. Subject Matter Jurisdiction

Like all federal courts, we possess limited jurisdiction, with ours being defined mainly by the Tucker Act. *Fisher v. United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005) (en banc). Under the Tucker Act, we have jurisdiction over non-frivolous allegations of statutory or regulatory violations "in connection with a procurement or a proposed procurement." *Distributed Sols., Inc. v. United States*, 539 F.3d 1340, 1345 (Fed. Cir. 2008).

First, Percipient has alleged a non-frivolous violation of 10 U.S.C. § 3453, which provides, in short, that defense agencies and their contractors must acquire "commercial products" "to the maximum extent practicable." § 3453(b)(1)-(2). To that end, the statute requires agencies to conduct market research throughout the procurement process—including before each task order award—to identify commercial products that (1) "meet the agency's requirements," (2) "could be modified to meet the agency's requirements," or (3) "could meet the agency's requirements if those requirements were modified to a reasonable extent." § 3453(c)(1)-(2). In addition, offerors of commercial products must be given an opportunity to compete. § 3453(a)(3).

While the parties may dispute the merits of Percipient's claim, no party has argued Percipient's allegations are frivolous. Indeed, Percipient alleges specific facts that, if true, may violate §3453. Percipient alleges that it owns a commercial product that could fulfill NGA's computer vision

5

requirements and that NGA ignored whether a commercial solution existed before it allowed CACI to develop a solution.[3]

Second, to invoke our bid-protest jurisdiction, a protestor must allege a "violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1) (2018). The statute's "operative phrase 'in connection with' is very sweeping in scope." *RAMCOR Servs. Group v. United States*, 185 F.3d 1286, 1289 (Fed. Cir. 1999). The phrase encompasses any statutory violation connected to a procurement, and a procurement includes "all stages of the process of acquiring property or services, beginning with the process for determining a need for property or services and ending with contract completion and closeout." *Distributed Sols.*, 539 F.3d at 1345 (quoting 41 U.S.C. § 111).

With this in view, NGA's alleged violation of §3453 has a connection to a procurement. That is because §3453 is itself a procurement statute and establishes a preference for commercial products and services. A violation of a statute that sets out what an agency can lawfully acquire has a connection to a procurement. *RAMCOR*, 185 F.3d at 1289 (holding that a violation has a connection with a procurement when an agency's actions under that statute affect the award or performance of the contract).

The government disagrees and argues that Percipient's protest is not in connection with a procurement and is instead a challenge to NGA's administration of the SAFFIRE contract. In reaching that conclusion, the government reasons that Percipient's protest cannot be in connection with a procurement because it alleges a post-award statutory violation that relates to NGA's oversight of CACI's performance.

We reject the government's characterization of Percipient's protest. A protest does not become a contract administration dispute simply because the agency's statutory violation occurs after the contract award. Indeed, the Tucker Act "does not require an objection to the actual contract procurement"—only an objection to a statutory violation with a connection to a procurement. *RAMCOR*, 185 F.3d at 1289. Nothing in the Tucker Act

---

[3] On the current record, we know that CACI will at least develop portions of the computer vision system, but it has not decided yet whether it will develop the entire system. Tr. 25:6–15.

suggests that those violations must occur before the contract award for the court to have jurisdiction.

Next, as a matter of statutory construction, the government invokes sovereign immunity to argue that we should narrowly construe the Tucker Act's jurisdictional grant to exclude post-award procurement violations. But the "sovereign immunity canon is just that—a canon of construction." *Richlin Sec. Serv. v. Chertoff*, 553 U.S. 571, 589 (2008). It does not "displace[] the other traditional tools of statutory construction" and, like all canons of construction, applies only when ambiguity exists. *See id.* at 590. No ambiguity exists here, however, as we simply apply the Federal Circuit's interpretation of the Tucker Act in this protest. *Distributed Sols.*, 539 F.3d at 1345.

Finally, CACI turns to the Federal Acquisition Streamlining Act's (FASA) task order bar, which excludes from our jurisdiction any protest "in connection with the issuance or proposed issuance of a task or delivery order." 10 U.S.C. § 3406(f)(1). It argues that we lack jurisdiction over Percipient's protest because its development of a computer vision system is being performed under a task order and therefore falls outside this court's jurisdiction. All of that may be true, but FASA's task order bar will not apply when, as here, a task order exceeds $25,000,000. § 3406(f)(1)(B). Thus, we conclude that we have subject matter jurisdiction over Percipient's protest, which alleges a non-frivolous violation of a statute "in connection with a procurement."

## II. Standing

Even though we may have subject matter jurisdiction, we can only exercise our jurisdiction when a plaintiff has established that it has standing to bring its claim. *Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1369 (Fed. Cir. 2002). Standing ensures that plaintiffs who seek review in federal court have a sufficient "personal stake in the outcome of the controversy." *Baker v. Carr*, 369 U.S. 186, 204 (1962). Although we are an Article I court, we apply Article III standing requirements. *Anderson v. United States*, 344 F.3d 1343, 1350 n.1 (Fed. Cir. 2003).

When it comes to bid protests, a plaintiff must do more than establish Article III standing. That is because Congress, through the Tucker Act,

provided that only an "interested party" has standing to challenge a procurement. 28 U.S.C. § 1491(b)(1) (2018). The phrase "interested party" "imposes more stringent standing requirements than Article III," *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1359 (Fed. Cir. 2009), and limits claims "to actual or prospective bidders" who have a "direct economic interest" in the award of the contract, *Am. Fed'n of Gov't Emps. v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001).

The government mostly disputes the first standing requirement, which requires a protestor to be an actual or prospective bidder. As all the parties agree, Percipient did not (and could not) bid on the SAFFIRE contract. That failure, in the government's view, is fatal to Percipient's protest and reveals that Percipient is simply a "disappointed subcontractor" without standing.

Normally, a protestor is an actual or prospective bidder if it either submitted a proposal in response to a solicitation, or it is "expecting to submit an offer" before the solicitation closes. *MCI Telecomm. Corp. v. United States*, 878 F.2d 362, 365 (Fed. Cir. 1989) (emphasis omitted). But the requirement that a protestor have submitted a bid for it to be an interested party is anything but absolute. For example, *SEKRI v. United States* refused to apply the actual or prospective bidder requirement to a challenge brought under a mandatory source statute because doing so would thwart Congress's intent behind the statute. 34 F.4th 1063, 1072–73 (Fed. Cir. 2022). *Distributed Solutions* allowed contractors to challenge an agency's noncompetitive procurement vehicle without bidding because they "were prepared to submit bids" if the agency had solicited them. 539 F.3d at 1345. *Elmendorf Support Services v. United States* held that an incumbent contractor need not be a bidder for it to challenge an agency's in-sourcing decision because it had an obvious interest in "maintaining its incumbency." 105 Fed. Cl. 203, 208–09 (2012). *Electra-Med Corporation v. United States* determined that contractors can be interested parties without bidding when they challenge an agency action that denies them the opportunity to compete. 140 Fed. Cl. 94, 103 (2018); *see also McAfee, Inc. v. United States*, 111 Fed. Cl. 696, 708–09 (2013). And finally, the interested party requirements have even been relaxed when their rigid application would make statutory guarantees illusory. *See Navarro Rsch. & Eng'g v. United States*, 94 Fed. Cl. 224, 230 (2010).

What these cases make clear is that the "judicial review of procurement methods should not be thwarted through the wooden application of standing requirements." *CCL, Inc. v. United States*, 39 Fed. Cl. 780, 790 (1997). In other words, those requirements should be sensitive to a protestor's specific claim and should not deny standing to those who otherwise have a sufficient "personal stake in the outcome of the controversy." *Baker*, 369 U.S. at 204.

With that in mind, we turn to the statute at issue. Under §3453, the critical issue is whether offerors of commercial products have standing. We conclude that they do and that §3453 does not require an offeror of a commercial product to have bid on the prime contract.

First, unlike most procurement statutes, §3453 contemplates that offerors of commercial products have rights under the statute. Specifically, §3453 provides that agencies must give offerors of commercial products "an opportunity to compete in any procurement to fill [the agency's] requirements." § 3453(a)(3). And this clause guarantees more than just a right to compete by bidding on the contract because the statute expressly distinguishes between bidders and offerors of commercial products. § 3453(b)(4) (requiring agencies to state their specifications "in terms that enable and encourage bidders *and offerors* to supply commercial services or commercial products" (emphasis added)); *see also Ysleta Del Sur Pueblo v. Texas*, 142 S. Ct. 1929, 1939 (2022) ("[D]ifferences in language . . . convey differences in meaning."). A violation of §3453 therefore denies these commercial product owners an opportunity to compete that is guaranteed to them by the statute, *see Electra-Med*, 140 Fed. Cl. at 103; *cf. Distrib. Sols.*, 539 F.3d at 1345, and that guarantee would become illusory if offerors of commercial products could not sue under §3453, *Navarro Rsch. & Eng'g*, 94 Fed. Cl. at 230.

Second, §3453 imposes an obligation on agencies to incorporate commercial products that continues beyond the contract's award. For example, agencies must conduct market research even before "awarding a task order or delivery order." § 3453(c)(1)(C). They must then use the results of that research to identify any commercial products that (1) "meet the agency's requirements," (2) "could be modified to meet the agency's requirements," or (3) "could meet the agency's requirements if those requirements were modified to a reasonable extent." § 3453(c)(2). So, putting

this all together, an agency must conduct market research even after the contract award and then, depending on the results, need to incorporate a commercial product. This means that an agency can still violate §3453 after the contract award and is why—unlike most other protests—it is irrelevant whether the commercial product offeror bid on the prime contract.

The government emphasizes Percipient's inability to perform the entire contract and appears to suggest that standing under §3453 is limited to those offerors whose commercial product can meet every requirement in a solicitation. But the statutory text does not support this conclusion as it provides in at least one part that agencies must "require prime contractors and subcontractors . . . to incorporate commercial services [and] commercial products . . . as *components of items supplied* to the agency." § 3453(b)(2) (emphasis added). The word "component" means a "part or element of a larger whole" and contradicts a requirement that commercial products satisfy every agency requirement. New Oxford American Dictionary (3d ed. 2010).

Because the text's meaning is plain, we could stop there. *Carcieri v. Salazar*, 555 U.S. 379, 387 (2009). But relevant caselaw further suggests that this ability of a commercial product to meet every agency requirement is unnecessary for standing under §3453. In *Palantir USG v. United States*, the Federal Circuit held that the Army violated §3453 when it failed to use market research results to identify possible commercial solutions, but it reached that conclusion without deciding whether Palantir's product could satisfy every Army requirement. *See* 904 F.3d 980, 990–91, 993 (Fed. Cir. 2018).

Third, the statute uniquely expresses a significant preference for commercial products. That preference manifests itself throughout the statute by imposing obligations that require agencies to consider commercial products at nearly every stage of the procurement. This preference then culminates in Congress encouraging agencies to sacrifice their own requirements if doing so would allow the agency to incorporate a commercial product or service. § 3453(b)(3), (c)(2)(C). It would thwart Congress's intent behind §3453 if offerors of commercial products could not bring challenges under the statute. *SEKRI*, 34 F.4th at 1072–73.

We thus hold that offerors of commercial products need not bid on the prime contract to have §3453 standing. Instead, the appropriate question in

this context is whether the protestor was prepared to offer its commercial product to the agency if the agency had complied with the statute. In this case, Percipient's actions over the last two years make clear that it was willing and ready to offer its commercial software.

On a different note, CACI contends that offerors of commercial products do not have §3453 standing because procurement violations, like the one alleged here, can be prevented through congressional oversight. No doubt, Congress has the power to oversee federal procurements, yet Congress vested this court with exclusive bid protest jurisdiction and surely had in mind that we would remedy procurement violations. And again, *Palantir* upheld a protestor's §3453 challenge even though Congress had taken some remedial steps of its own. *See, e.g.*, National Defense Authorization Act for Fiscal Year 2017, Pub. L. No. 114-328, §§ 113, 220 (2016).

The government's final salvo is to once again argue that offerors of commercial products cannot challenge a post-award violation of §3453 because these disputes become challenges to the government's contract administration. Just as we rejected this argument as a jurisdictional defense, we reject it here too. For one thing, requiring these challenges to be brought before contract award makes little sense when §3453's requirements continue beyond the contract's award and can still be violated afterward. But for another, that limitation would also allow agencies to ignore §3453 with impunity as long as they defer decisions about commercial products until after the contract award. That result would be untenable, especially when Congress enacted this statute to stem wasteful and inefficient agency spending.[4]

---

[4] *See, e.g.*, *Formula for Action: A Report to the President on Defense Acquisition by the President's Blue Ribbon Commission on Defense Management* at 23–24 (April 1986); H.R. Rep. No. 103-545, at 21 (1994); S. Rep. No. 103-258, at 6 (1994); H.R. Rep. No. 103-712, at 233 (1994) (Conf. Rep.); S. Rep. No. 112-173, at 162–63 (2012); *Hearing to Receive Testimony on the Current Readiness of U.S. Forces in Review of the Defense Authorization Request for Fiscal Year 2014 and the Future Years Defense Program: Hearings Before the Subcomm. on Readiness and Management Support, Comm. on Armed Services*, 113th Cong., 1st Sess. 24–27 (2013) (statement of Sen. McCaskill); *Hearing to Receive Testimony in Review of the Defense Authorization Request for Fiscal Year 2016 and the Future Years*

Finally, the parties do not seriously dispute Percipient's economic interest. A protestor has a direct economic interest if, "but for the alleged error in the procurement process," it would have received an award. *Info. Tech. & Applications v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003). The only argument advanced against Percipient's economic interest is its failure to bid on the SAFFIRE contract. But Percipient is an offeror of a commercial product under §3453 and is prepared to offer NGA its product. Viewed in that light, Percipient has an economic interest in that opportunity. Thus, Percipient has standing to challenge the agency's alleged violation of §3453.

### III. Timeliness

The government and CACI assert two timeliness defenses, both of which we reject. First, the government invokes *Blue & Gold Fleet v. United States*, which held that a protestor waives its right to protest if it "has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process." 492 F.3d 1308, 1313 (Fed. Cir. 2007). In the government's view, Percipient's protest is essentially a challenge to the solicitation and is therefore waived under *Blue & Gold*.

We disagree: In the limited record we have, nothing in the solicitation appears to violate §3453. The solicitation was flexible enough to allow for a development solution, but it did not require one. And that approach is entirely consistent with §3453, which allows for development solutions when a commercial one is impracticable or nonexistent. Likewise, NGA's actions here only confirm that the solicitation did not require a development solution as NGA repeatedly explained to Percipient that there would be opportunities for Percipient to offer its commercial product. Thus, Percipient's protest is not barred by *Blue & Gold*.

Second, CACI argues that Percipient's complaint is barred by the doctrine of laches. In essence, laches is "a defense developed by courts of equity to protect defendants against unreasonable, prejudicial delay in commencing suit." *SCA Hygiene Prods. Aktiebolag v. First Quality Baby*

---

*Defense Program: Before the Subcomm. on Airland of the S. Comm. on Armed Servs.*, 114th Cong. 60–62 (2015) (statement of Sen. Cotton).

*Prods.*, 580 U.S. 328, 333 (2017). CACI maintains that laches applies because Percipient's protest should have been brought in March 2021 when, according to CACI, Percipient first learned of a potential §3453 violation.

We cannot apply the doctrine of laches to defeat Percipient's cause of action on a motion to dismiss. Of course, a party's delay in suit is relevant when deciding whether to grant a permanent injunction, which requires us to consider, among other things, "whether the balance of hardships leans in the plaintiff's favor." *Fed. Acquisition Servs. Team v. United States*, 124 Fed. Cl. 690, 708 (2016). But the Supreme Court has long held that laches is not an affirmative defense when a statute of limitations exists. *United States v. Mack*, 295 U.S. 480, 489 (1935). A statute of limitations is a "congressional decision that the timeliness of covered claims is better judged on the basis of a generally hard and fast rule rather than the sort of case-specific judicial determination that occurs when a laches defense is asserted." *SCA Hygiene*, 580 U.S. at 334–35. Thus, applying laches to a claim brought within the statute of limitations violates "separation-of-powers principles" because it would "give judges a 'legislation-overriding' role that is beyond the Judiciary's power." *Id.* at 335 (quoting *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 680 (2014)).

In this case, Congress has established a six-year statute of limitations for any claim in this court, 28 U.S.C. § 2501, and we "are not at liberty to jettison Congress' judgment on the timeliness of suit," *SCA Hygiene*, 580 U.S. at 335. Therefore, because Percipient's suit was brought within six years, its claim is timely, and laches is no defense.

CONCLUSION

In sum, we have subject matter jurisdiction over Percipient's non-frivolous allegation of a statutory violation in connection with the SAFFIRE procurement. In addition, Percipient, as an offeror of a commercial product, has standing under §3453 because it was prepared to offer its product to NGA, and it had a direct economic interest in that opportunity. Therefore, the motions to dismiss for lack of subject matter jurisdiction are denied.

s/Eric G. Bruggink
ERIC G. BRUGGINK
Senior Judge